LUDWIG C. MEYER AND CHRISTIAN GREVE *v.* LUTHER C. CLARK, JOHN D. MAXWELL, AND DAVID CRAWFORD, JR.

It is a general rule that the voluntary payment of a claim, with a full knowledge of all the facts, where there is neither duress, compulsion nor fraud, is final, and the money cannot be recovered back on the ground that the party was under no legal obligation to pay it.

But this rule applies only where payment is made with a knowledge of, or with the means of ascertaining, all the facts, and under circumstances which must be regarded as equivalent to an acquiescence in the claim, and where the party receiving payment is entitled to treat it as received in the final settlement and discharge of the claim.

Hence, where the buyer of a certain amount of gold coin claimed that only a portion of it had been delivered to him, and notified the seller that unless the residue was delivered, he would buy the coin elsewhere on the seller's account, and the latter, in order to prevent such a purchase on his account, delivered the residue claimed to be due, under protest and expressly declaring that the delivery was made without a waiver of his rights: *Held,* that such subsequent delivery was not, by the intention of the parties, or necessarily by its operation or effect, a delivery under the contract of sale, and was not therefore conclusive upon the seller so as to prevent a recovery, in a proper action, of the amount so delivered.

Meyer v. Clark.

A contract of sale, where payment and delivery are to be contemporaneous acts, is not complete until payment is made; but the seller may waive the condition of simultaneous payment by an unconditional delivery of the actual possession of the goods, and in such case, in the absence of fraud, the delivery is good and title passes.

The plaintiffs' clerk delivered five bags of gold, weighed and marked, upon the defendants' counter. The defendants' clerk drew the bags to the inner side of the counter, and commenced to mark the tags attached to them with the plaintiffs' name, it not being the defendants' custom to weigh or count their contents: *Held*, a good delivering of the gold.

In a case where the testimony on either side cannot be said to be evenly balanced, it is not error to refuse to charge that if the testimony on the plaintiffs' part is balanced by that on the defendants' part, the latter is entitled to a verdict. It should be left to the jury to determine where the preponderance of testimony lies.

APPEAL by the defendants from a judgment entered on the verdict of a jury at trial term. The facts are fully stated in the opinion of the court.

*John E. Burrill*, for respondents.

*T. C. T. Buckley*, for appellants.

DALY, F. J.—The questions of law argued upon the motion for a new trial are so involved with the pleadings and the evidence, that an examination of both will be necessary to a clear understanding of the points to be passed upon.

The plaintiffs aver that before the 26th of September, 1864, they sold to the defendants $25,000 of gold coin, at the rate of 212½ per cent., and upon the same day delivered it to the defendants; that the defendants have paid them only for $20,000 gold, and they bring their action to recover for the remaining $5,000, which, at the rate agreed upon, is $10,625 in currency.

The defendants answer that the plaintiffs delivered $20,000 gold on the 26th of September, and the remaining $5,000 on the 29th of September thereafter, and that the defendants have paid them for the $25,000 at the rate agreed upon.

The issue, therefore, upon the pleadings is, whether the defendants have, as they aver, paid the remaining $5,000 or not.

It was shown on the part of the plaintiffs that on the 26th of September they sent five bags of gold, each weighing $5,000, to the defendants. The five bags were sent to the defendants' office in Wall street—the plaintiffs' chief clerk, Kirholtz, carrying two, and the plaintiff's porter, Corneilson, carrying three. The clerk and porter entered the defendants' office together; the porter placed the three bags carried by him upon the defendants' counter, and the clerk did the same with the two bags he was carrying. The porter then placed his three bags together and took the two bags from Kirholtz and placed them upon the top of the three in the form of a pyramid. After that Kirholtz called the defendants' gold clerk, Wheeler, and said to him: "Here is $25,000 of gold from Meyer & Greve" (the plaintiffs), and the gold clerk answered, "All right." The plaintiffs' clerk, Kirholtz, handed the statement of the amount to the plaintiffs' porter, Corneilson, and Corneilson afterward handed it to the gold clerk. When Kirholtz had attracted Wheeler's attention to the $25,000 of gold, and the latter answering "All right," Kirholtz left the office. As he left, the five bags were at the outer side of the counter, about five inches from the edge, the plaintiffs' porter, Corneilson, guarding the gold, having both his arms extended around the bags, and leaning over so that the bags were close to his body. As Kirholtz left, he told Wheeler to give the check for the gold to Corneilson, Wheeler having at the time in his hand the statement which Kirholtz had given to Corneilson, and after Wheeler had said "all right." As Kirholtz was leaving, he saw Wheeler extend his hands and commence to draw a bag of gold over to his (Wheeler's) side of the counter. Corneilson, the porter, testified that Wheeler drew the five bags, one after the other, over to his side of the counter and commenced marking them, there being then six or seven persons at the counter; that Wheeler marked the first and second bags, and put them successively behind him upon a shelf, and as he put each upon the shelf he turned around, turning his back to the counter; that he, Corneilson, afterward turned around and saw Wheeler putting up another bag, there being then but one bag upon the counter, and as Wheeler turned toward the counter he said to the wit-

ness: "Where is the other bag? there is one bag missing;" to which Corneilson replied "that he did not know; that he had delivered to him five bags." But Wheeler claimed that he had delivered but four. That there were then four or five, or there might have been six, persons at the counter; that Mr. Maxwell, one of the defendants' firm, then offered Corneilson a check for $20,000 of gold, but witness said he had delivered $25,000, and that he wanted a check for that amount; to which Mr. Maxwell answered, "that he might either take the gold or a check for $20,000 of gold," which Corneilson refused to do, and brought back the four bags to the plaintiffs, which were, on the following day, returned to the defendants, and the check for $20,000 received. Mr. Gentil, one of the largest dealers in gold, was standing at the counter talking to Mr. Maxwell while Kirholtz and Corneilson were in the office, and the witness saw what appeared to him to be five bags of gold together on the counter, lying in front of Kirholtz and another person. They seemed to the witness to be in a pile. He could not say whether there was one on top, but he thought that there were two bags on the top of the others. On the 29th of September the defendants, by letter, required the delivery under the contract of the remaining $5,000 of gold, at 212½ per cent., declaring that otherwise they would buy it on the plaintiffs' account. The plaintiffs, in answer, sent $5,000 in gold, with a letter declaring that they considered that they had delivered the $5,000 gold under the contract, and that they sent $5,000 gold, at 212½ per cent., under protest, and without prejudice to their rights.

Upon this testimony the plaintiffs rested. The defendants moved for a nonsuit, the grounds of which need not now be considered, as the motion was renewed at the close of the case.

On the part of the defendants, Wheeler, the gold clerk, testified that Kirholtz handed him a slip of paper saying, "Here is our gold,"—or Meyer & Greve's gold—"give the check to this man," pointing to Corneilson; that he, Wheeler, took the paper from Kirholtz, together with the two bags of gold, drawing the two bags by their mouths over to his (Wheeler's) side.

of the counter, where he marked them and placed them on the gold shelf, which was six or eight feet from the inner side of the counter. That he then came back to the counter and took one bag from Corneilson, marked it, and put it upon the shelf, and that when he came back to the counter for the fourth bag, Corneilson was not there, and he saw that there was but one bag remaining. That he then called out "Meyer & Greve" twice, but no one answered. That he then said, "Who brought this gold?" but no one replied. That he then said to each one in front of the opening at the counter, there being two or three persons there, "Did you bring it?" but all denied any knowledge of it; upon which he marked the fourth bag and put it on the gold shelf. That he then took the statement and went to the desk, and after a short interval came back to the counter to see who would come in to claim the ownership of the gold, or to get a check for it, when he saw Corneilson coming down the William street steps of the defendants' office (the office being in a basement), who came up to the counter and asked for Meyer & Greve's check. That the witness asked him how many bags he had brought, and he said five, or $25,000. That the witness told him he had received but four, to which Corneilson made no audible reply. That he then asked him why he had gone out of the office, and repeated the question, to which Corneilson said nothing, but in a moment afterward asked for Meyer & Greve's check. That the witness told him that he had received but $20,000, four bags, and that he would give him a check for $20,000, to which Corneilson made no reply. That Mr. Maxwell, one of the defendants, then came up and asked Corneilson what was the matter, upon which the witness gave Mr. Maxwell his (the witness') version of it, while Corneilson merely said that he wanted the plaintiffs' check; and to the inquiries put to him said very little in reply. The witness had no recollection of seeing Mr. Gentil there, who was well known to him, and whose testimony as to the bags of gold being together in one pile was in conflict with that of the witness. The witness was then asked if he saw more than four bags, and answered that he was under the impression that the two young men brought in five bags, one

bringing two and the other three; that he was quite confident of that; and when Corneilson was pointed out to him in court he was unable to say whether he was the person who came with the gold, nor would he swear that he was the person whom he saw coming down the steps, and to whom he had previously referred as Corneilson, but thought that from his hair, his mode of dressing, and in other ways, that he was the same person.

Clark, one of the defendants' employees, testified that Wheeler took two bags from Kirholtz; that he saw the young man who was left in charge of the gold go out of the office and return in about three minutes afterward; that while he was gone Wheeler called out for Meyer & Greve, but the witness could not identify Corneilson when pointed out to him in court as the person he referred to.

Davis, the defendants' cashier, testified that he saw Wheeler come up to the counter, take two bags, draw them toward him, mark them, and put them on the shelf; that after Wheeler took the two bags, the witness saw one of the two men who brought the gold go out, and the next thing he heard was Wheeler's statement that the delivery was short, and that there was a bag missing; and that he heard Wheeler call out twice for Meyer & Greve, and heard him ask two or three persons at the counter if they had brought the gold; that when this occurred there was no one there who made any response to the call for Meyer & Greve, or representing the gold; that the next he saw was a person coming down the steps, who came up to the counter and demanded a check for Meyer & Greve's gold. That Wheeler asked why he had left the office; why he did not stay with the gold; that the witness heard no answer; but afterward, in the conversation which the young man had with Maxwell, he heard him use words tantamount to saying that he had delivered the five bags.

Dolson, one of the defendants' clerks, corroborated substantially the statements of the last witness—that he saw Wheeler come over and take two bags from the outside of the counter, draw them over, mark them, and put them on the shelf; that he afterward heard him call for Meyer & Greve and ask who brought the gold, without receiving any answer; that the wit-

ness next saw a young man come in at the William street door, who came up to the witness and asked him for a check for gold, and the witness referred him to Wheeler, who told him that he had received but four bags—that there was one short, to which the young man said nothing. That Wheeler asked him if he had gone out of the office and he said "No." Wheeler said, "Why did you leave the office?" and the young man made no answer.

Maxwell, one of the defendants, testified that when he came up and heard of the missing bag, Wheeler and Clark told him that the young man had gone out and left the bags; that he asked him why he had gone out, leaving the gold unprotected, and that he made some ejaculation, which the witness supposed was intended for a denial—upon which the witness said, "Here is Mr. Wheeler and Mr. Clark who saw you go out," and that the only reply of Corneilson was that he wanted a check for $25,000 of gold, and would not take one for $20,000. The witness also testified that at the time there were two or three bags of gold upon the floor where the parties stood near to the counter, and down at their feet, which was the place for the temporary deposit of gold, when they were in a hurry, and Greve, one of the plaintiffs, testified that Wheeler told him that he saw five bags upon the counter, but that he had received only four.

This being, in substance, the testimony, the defendants, as before stated, renewed their motion for a nonsuit upon several grounds. They claimed, that as it appeared both by the pleadings and by the evidence, that the plaintiffs had voluntarily delivered the additional $5,000 with a full knowledge of all the facts, they could not recover in this action, relying in support of this objection upon the cases of the *Supervisors of Onondaga* v. *Briggs*, 2 Denio, 26 ; *Fleetwood* v. *The City of New York*, 2 Sandf. 475; and *Forrest* v. *The Mayor &c. of New York*, 13 Abb. R. 350.

In the first of these cases, it was held, that moneys paid to a district-attorney by a board of supervisors, over and above his lawful compensation, upon the auditing and settling by them of his accounts, and with a full knowledge of all the facts, could

not be recovered back, and in the two latter cases it was decided that where the owner of land in the city of New York, voluntarily paid to the corporation an assessment upon it, though accompanied by a protest to the Street Commissioner, against the legality of the assessment, he could not recover it back again, even though the assessment may have been illegal and void.

It is undoubtedly a general rule that the voluntary payment of a claim, with a full knowledge of all the facts, where there is neither duress, compulsion, nor fraud, is final, and that the money cannot be recovered back upon the ground that the party was under no legal obligation to pay it.

This rule was first deliberately settled by the decision of the majority of the court, in *Brisbane* v. *Dacres* (5 Taunt. 144), and the reasons there given for it, and which must be considered in determining whether it does or does not apply in the present case, are set forth with great clearness by Sir Vicary Gibbs, after a full investigation of the subject and a review of the previous adjudications. " Where a man," he says, " demands money of another, as a matter of right, and the other, with a full knowledge of the facts upon which the demand is founded, has paid a sum, he never can recover back the sum he has so voluntarily paid," and the reasons he gives are substantially these : By submitting to the demand, he that pays the money *gives* it to the person to whom he pays it. He makes it his, and closes the transaction between them. He that receives it *has a right to consider it his without dispute.* He spends it in the confidence that it is his, and it would be most mischievous and unjust if he who has acquiesced in the right, by such voluntary payment, should be at liberty to rip up the matter and recover back the money. He who received it is not in the same condition. He may spend it in the confidence that it is his, and may not have the means of repayment. The party who paid it may afterwards, and upon a further view, have a different opinion of the law, and it may be that that opinion is the correct one ; but there are many doubtful questions in the law, and when a question arises, the party has his option to litigate it, or to submit to the demand and pay the money ; and if

he does the latter, he closes and puts an end to the transaction, for were it to be held otherwise, many inconveniences would arise. Justice Heath, in the same case, gives the reason more tersely: "For the plaintiff is a judge in his own case, and decides against himself, and he cannot be heard to repeal his own judgment;" and the Chief Justice, Sir James Mansfield, illustrated the rule in its application to Admiral Dacres, to whom the money in that instance was paid: "It would be most contrary to *equum et bonum* if he was compelled to pay it back— for see how it is, if the sum be large, it probably alters the habits of his life; he increases his expenses, he has spent it over and over again; perhaps he cannot repay it at all, or not without great distress; is he then, five years and eleven months afterward, to be called upon to repay it?" It is apparent, from the reasons here given, that this rule was intended to apply where payment is made under circumstances which must be regarded as equivalent to an acquiescence in the claim, and where the other party is entitled to treat it as received in the final settlement and discharge of it. In *Fleetwood* v. *The City of New York* (*supra*), Chief Justice Sandford says, that "where there is no legal compulsion, a party yielding to the assertion of an adverse claim, cannot detract from the force of the concession by saying that he objects or protests at the same time that he actually pays it; for the payment nullifies the protest as effectually as it obviates the previous denial and contestation of the claim." This may be true in certain cases, and it may have been strictly applicable to the case which was then before the court. Several lots of ground, belonging to the plaintiff, in the city of New York, had been sold for the nonpayment of an assessment for filling them up. The lots were redeemable under the assessment sale within a given period, upon the repayment of the amount of the purchase-money with interest, at the rate of twenty per cent. per annum, and were within that period redeemed by the plaintiff, who paid the amount and the interest to the Street Commissioner, accompanying the payment by a protest to that officer against the validity of the assessment. The plaintiff afterward brought an action against the city to recover back the amount he had paid, upon the

ground that the assessment was illegal and void, and it was held that he could not recover it. The corporate authorities and the purchaser at the assessment sale, as it appeared, had maintained that the assessment was valid, whilst the plaintiff insisted that no corporation ordinance had ever been legally passed to authorize the filling up of the lots. If the plaintiff was right, the whole proceeding was void, and the purchase and conveyance of the property under it was, as the court held, no cloud upon the plaintiff's title. He might, if such were the fact, have treated the whole proceeding as nugatory; but he was negotiating for a loan by mortgage upon the lots, and finding this assessment an obstacle to his obtaining it, he saw fit, instead of abiding the result of a litigation which was then pending to test the validity of the assessment, to redeem the property by the payment of the purchase-money with the interest, at the rate of twenty per cent. By doing this he necessarily recognized and acquiesced in the validity of the assessment and of the sale and conveyance under it, for his protest could be productive of no effect, being made to the Street Commissioner, an officer who was simply the head of one of the many departments which exist under the complex municipal government of this city, who had no discretion whatever in the matter, nor any power or control over the money. That officer, by statute, was bound to receive the money when the plaintiff tendered it, and when received, it belonged, not to the corporation, but to the purchaser, and was immediately payable over to him. The plaintiff, as before suggested, was at issue with the purchaser and with the corporate authorities as to the fact which the plaintiff relied upon to show that the assessment was illegal. The purchaser, after the payment of the assessment and of the interest upon it, was entitled, at the expiration of the period limited, to a lease of the property for the term of years for which he had agreed to take it, at the assessment sale, if the owner should not in the meanwhile redeem it (Valentine's Laws relating to the City of New York, 1,238). But the plaintiff, by redeeming under the assessment sale, cut the purchaser off from the exercise of this right, and put it out of his power to obtain his lease, which, if the assessment were valid,

as the purchaser claimed it to be, would have vested in him the property for a term of years. By this act the plaintiff did what he could not afterward undo. The purchase-money and the twenty per cent. interest upon it, when paid, is, by the express term of the statute, paid to the use of the purchaser. The plaintiff, therefore, by paying it, paid it in effect to the purchaser, and his claim to recover it, under these circumstances, afterward from the city, was wholly without foundation. By his own act he had put an end to the matter in controversy—an act which he did not and could not qualify by his protest, there being no one upon whom the protest could operate or take effect.

But it may be very different between two principals in a transaction, where one of them, as in the present case, claiming that a certain amount of gold only has been delivered, demands the delivery of the residue, or that they will buy it on the other party's account, and the other party, to prevent an act which might further complicate the transaction, sends the amount in dispute, with a distinct statement, however, that they consider that they have already delivered all that they engaged to do, and send it, therefore, under a protest, and with the express declaration that they do it without prejudice to their rights. This cannot be regarded as a delivery of gold under the contract. It was not so intended by the plaintiffs, and could not, under the notice given to them, be so regarded by the defendants. It was sent for a special reason, because the defendants had notified the plaintiffs that they would buy $5,000 gold on their account, and it might be, if that were done, that the gold when bought would be at a higher rate of premium, which would increase the plaintiffs' liability if it should be ascertained that their agents had not delivered the missing bag. The rule under consideration, moreover, applies only when the act, which is regarded as conclusive, whether it be a payment or a delivery, is done with the full knowledge of, or with the means of ascertaining, all the facts (*Martin* v. *Morgan*, 1 Brod. & Bing. 289; *Spragg* v. *Hammond*, 2 Id. 59; *Braunton* v. *Roberts*, 4 Bing. 11), which cannot be said to exist here, so as to give to this act necessarily the force and effect of a delivery under the contract.

The distinction, as has been said (*Martin* v. *Morgan*, *supra*), is between a mistake of the law and an ignorance of, or a misconception of, the facts of the case. It is a rule as old as "Doctor and Student" (ch. 46), that a man is bound at his peril to have knowledge of what the law is, the maxim being *ignorantia juria non excuscat;* but it is otherwise in respect to the facts, and a man may be excused where he acts in ignorance of them and without the means of knowledge. In *Chatfield* v. *Paxton* (see note a. to *Bilbie* v. *Lumley*, 2 East, 469), the plaintiff, upon accepting a bill, was under great uncertainty as to the facts, and afterward paid it, under a protest that if, upon his arrival in India, he afterward found his impressions confirmed, he should call upon the house there to indemnify him. He brought the action afterward against a partner of that house, and recovered the amount back. Ashurst, J., upon the motion for a new trial, said "that where a payment had been made, not with the full knowledge of the facts, but only under a blind suspicion of the case, and it was found to have been paid unjustly, the party might recover it back again;" and Lawrence, J., agreed, though of opinion that the plaintiff was apprised of the general outline of his defense when he made the payment, but was not then so conversant with the particular facts, as they appeared at the time, as to have been able to resist the demand then made on him, if an action had been brought, but seemed to have only a confused notion of them.

The plaintiffs in this case cannot be said to have had a knowledge of all the facts, within the meaning of this rule. They were not present when they transpired, and those who were present were in direct conflict as to what had actually occurred. The missing bag was probably stolen by some one from the counter, either through the negligence of the plaintiffs' porter in quitting the custody of it before the defendants' gold clerk had taken possession of it; or through the want of proper care and vigilance on the part of the latter, after it had been delivered into his custody. There was presented here a question of great doubt and difficulty, upon which a former jury were unable to agree, and which the jury on the present trial decided upon a direct conflict between the witnesses. If the

Meyer v. Clark.

account given by the defendants' witnesses were correct, the bag had never been delivered into the possession of the defendants' gold clerk, and was lost through the negligence, or by the instrumentality, of the plaintiffs' porter ; while if the version which he and the plaintiffs' clerk gave were true, the bag had been delivered into the custody of the gold clerk, and its loss was attributable to his negligence. It does not appear in the case that the plaintiffs knew the facts as given by the defendants' witnesses, but even if they did, they could not then know what was the true state of facts, for the question was one that could be ascertained and settled only by a judicial investigation ; and this being the case, there was a propriety in their taking such a course as would lead to that disposition of it. There was, as I have before suggested, a reason for their delivering the additional $5,000 in coin, and the protest which accompanied the act was a clear intimation that it was not to be taken as any acquiescence in the defendants' claim. What they did was equivalent to saying, " We consider that we have fully performed the contract on our part, and will bring an action to compel the full performance of it on your part ; but to dispense with the necessity of your buying gold on our account, which would but complicate the transaction, and might increase our liability if it should be ascertained upon a judicial investigation that our agents did not deliver the missing bag, we will send you an amount of gold equal to the amount in dispute, but with the distinct understanding that it is not a delivery under the contract, and that the payment for it is not to be regarded as a payment upon the contract." They might actually infer that they had the right to do this, and that their protest would prevent their being concluded as to the matter in dispute, from the meaning which is ordinarily attached to a protest, in the popular acceptation of that term, as will be found by consulting the common and usual work of reference. Thus, in the New American Cyclopedia, a work of a popular character, and in very general use, there is given under that head this definition : " One who is called upon to pay an import duty, a tax, a subscription, or the like, which he thinks he ought not to be required to pay, but is unwilling to encounter the delay and ex-

pense of a law-suit at that time, pays the sum demanded under protest—that is, he accompanies the payment by a written and attested declaration of what he deems the illegality of the demand, and of his rights of defence and denial. This protest preserves all those rights, and in any subsequent suit or other effort to get the money back, the protest will prevent him from being impeded by his payment." In the last edition of Webster's Dictionary, a similar definition substantially is given. In the Law Dictionary of Burrill, it is declared to be " a solemn declaration against an act about to be done, or already done, expressive of disapprobation or dissent, or made with a view of preserving some right, which, but for such declaration, might be taken to be relinquished," and it is an old rule in pleading that a party may admit that an act has been done, and at the same time protest that he may not be concluded by his admission in the future enforcement of his rights (Coke Lit. 124 b.; Finch's Law, 359, 360; Termes de la Ley, 467; Plowden's R. 275).

I concede that where the facts are, in their nature, doubtful, and there is no special reason why the party should make the payment, or the delivery claimed—there being no coercion, concealment, or bad faith on the other side—he must be regarded as deciding a doubtful matter against himself, if he make the payment or the delivery, and he cannot be allowed afterward, in the language of Justice Heath, to repeal his own judgment. But that is not this case. The gold was sent for a special reason. It was accompanied by a protest and reservation of the plaintiffs' rights, that the act might not be misunderstood and taken to be a de-delivery under the contract. The plaintiffs, considering that they had delivered the $5,000 referred to in the defendant's letter, but not knowing, as may be inferred from the conflicting statements of their own and the defendants' agents, how the fact might be, sent the gold, as they expressed it, " without any prejudice to their rights," which, so far from indicating any intention to decide in a doubtful question against themselves, was a very clear intimation that they meant to test, by an action upon the contract, whether their agents had or had not delivered the missing bag, before it was purloined or lost, and that the

sending of the $5,000 gold was not meant to be an act of performance under the contract, but an act distinct and apart from it—an arrangement in which, I think, the defendants may not be regarded as acquiescing, as it does not appear from anything in the case that they expressed any dissent or returned any answer. They paid for it, and the plaintiffs no doubt applied the payment upon it as a distinct .transaction, and not as a payment upon the contract. My conclusion, therefore, upon this point, is, that the sending of the gold was not, by the intent of the parties, or necessarily by its operation or effect, a delivery of gold under and in pursuance of the contract.

The next point raised upon the motion for a nonsuit, was that, upon the uncontradicted evidence in the case, there was no proof of the delivery of the missing bag, which objection was founded upon several distinct grounds. 1st. That there was no proof of its contents. 2d. That the defendants were entitled to examine it to ascertain the quantity it contained, and it was found to be missing before they could do so. 3d. That if, by the custom, the examination of the tag upon the bag, and the marking of the name upon it, was a substitute for the examination of the contents, then that had not been done. 4th. That payment was to be made simultaneously with the delivery, and that the bag, when found missing, had not been paid for. 5th. That the bag was, at no time previous to the loss of it, out of the reach or control of the plaintiffs' porter, and the delivery of it was therefore not complete.

If, as Corneilson testified, he had the five bags together in a pile, upon the outer side of the counter, with his hands extended around the pile, and with his body leaning over it, and that, while in this attitude and protecting the gold, Wheeler, the gold clerk, came and took each bag separately over to his, the inner side of the counter, and commenced marking them, the gold must be regarded as having been taken into the possession of the defendants' agent, by the physical transfer of it from the custody of the one to that of the other ; and if, after this took place—after it was in the actual possession and under the control of the defendants' gold clerk—it was stolen or lost, the delivery of it, on the part of the plaintiffs' porter, was as complete

as it was in his power to make it.   It was taken out of his possession, removed bag by bag, from the secure position in which he placed and guarded it upon the counter, and if the defendants' gold clerk took it and placed it in a position where it was unsafe, and it was thereby *stolen or lost before* he had examined or marked it, its loss is to be attributed wholly to the act of the defendants' agent; the delivery on the part of the plaintiffs being as complete, under the circumstances, as it could be.

A contract of sale, where payment and delivery are to be contemporaneous acts, is not complete until payment is made, but the seller may waive it by an unequivocal delivery of the actual possession, and if he delivers freely and absolutely, without any fraud on the part of the vendee, the condition of payment simultaneously with the delivery is waived, confidence being reposed, and the property passes. (*Smith* v. *Lyons*, 5 N. Y. 41; *Ward* v. *Shaw*, 7 Wend. 406.)   If the article is placed in the actual corporal possession of the buyer, the seller giving up all hold on the goods, as already in the buyer's possession, and at his disposal, the delivery, in the absence of fraud, is complete (Bell's Contract of Sale 116).   "When," says Justice Blackburn, "the seller gives to the buyer the actual control of the goods and the buyer accepts such control, he has actually received them." (Blackburn's Contract of Sale 23.)   Such was the case here.   The bags of gold were given to the defendants' gold agent, who accepted the control of them, and while under his control one of them was stolen or lost.   This having occurred, it was no longer in the plaintiffs' power to reclaim the property, upon the defendants' refusal to pay for it.   They put their refusal upon the ground that it had never been delivered to them, while the fact was, as the jury have found, that it was lost after the plaintiffs' porter had surrendered and given over to the defendants' agent the custody and the control of it.

Where anything remains to be done by the seller, as where upon a sale of timber, which is to be transported to the place of delivery, and there, before delivery, measured and inspected, which had not been done (*McDonald* v. *Hewitt*, 15 Johns. 349); or between the buyer and seller, as where out of a larger quan-

tity of an article a smaller quantity is agreed for, which has not been selected, ascertained, or weighed (*Rapelyea* v. *Mackie*, 6 Cow. 250), and the property in either of these instances is destroyed by fire, the loss is upon the vendor, there being no delivery, actual or constructive—something remaining to be done before a delivery could be made. But in the present case, the five bags of gold had been weighed by the plaintiffs' clerk, and the quantity or value of each, which was $5,000, was ascertained in the presence of one of the plaintiffs, and marked upon each bag, that being the customary mode among dealers in gold coin of ascertaining the quantity or value. This was done immediately upon the five bags being taken out of the bank, and upon its being done, they were sent to the defendants' office to be delivered; so that when the five bags were taken by the gold clerk, nothing remained to be done by the plaintiffs, nor by the defendants, with respect to ascertaining the quantity, for all the defendants' gold clerk did, upon receiving the gold in their office, was to mark upon the tag of each bag the date and the name of the person it came from. He testified that the defendants never weighed gold; that they never had gold scales in their office; but that the practice was to mark the tags on the bags when a delivery was made, that being the usual custom among the dealers. The defendants' agent, therefore, accepted the five bags, when he took them out of the possession of the defendants' porter, without any question as to the quantity or intention to examine the contents of the bags, or to weigh them; so that the delivery was in all respects complete. The marking of the date and of the name of the person from whom received upon the bags, was an act in no way essential to delivery, but an act simply for the defendants' convenience thereafter, as noting the day when, and the person by whom, each bag was delivered. The bags may, as the defendants claim, have been within the reach of the defendants' porter and within his control, after they were successively taken by the gold clerk and placed by him upon the inner side of the counter, but the question is, in whose custody were they when the missing bag was stolen or lost. They were, according to Corneilson's testimony, well guarded and secured when he had the five together in a pile, and the

jury, by their verdict, must have believed his statement to be
true.     When the gold clerk, therefore, took the first bag from the
pile, he took it into his custody, and might have placed it wher-
ever he pleased.     It was then in his possession, and as the
amount which it contained was marked upon it, and as it was
not, by the defendants' custom, to be counted or weighed, the
delivery of it was complete.     He might have taken it and placed
it upon the gold shelf, which was inside of the counter, where it
would have been secure, and marked it there, leaving, mean-
while, the remaining four in the custody of the plaintiffs' porter,
and so on successively, with each of the bags, until they were all
placed upon the gold shelf and marked, and by this means have
prevented the loss of any one of them.     This, very nearly, was
the gold clerk's account of what he did ; but his statement was
in conflict with the testimony of the plaintiffs' witnesses, whom
the jury believed.     Assuming then, as we must, that the porter's
account is the correct one, the gold clerk took each bag succes-
sively from the pile which the porter was securely guarding, un-
til he had them all together upon the inside of the counter, where
he commenced marking them ; and when he did this the delivery
was complete, the porter was released from the further care of
them, and they were then in the custody and under the control
of the gold clerk.

The next objection taken is, that there was not sufficient
proof of the contents or value of the missing bag.     The proof
was ample.     All the bags were weighed, as before stated, before
they were sent from the plaintiffs' office, and each bag weighed
$5,000 gold.     Each bag was weighed on scales and by a weight
representing $5,000 in United States gold coin, which had been
in use in the plaintiffs' office since 1864, and by which hundreds
of thousands of dollars had been weighed ; by which the plaint-
iffs ascertained the weight of the gold sold or received by them,
weighing three, four, or five hundred thousand dollars a day, and
sometimes weighing, by the same weight, as many as a hundred
bags a day.     A bag was never opened unless the weight was
found to be light, when it was examined and the contents
counted.     There was abundant evidence showing that this was
the mode by which, among the dealers, the amount or value of

Meyer v. Clark.

the contents of a bag was ascertained, and there was no pretense that there was any deficiency in the four bags for which the defendants gave their check. Numerous exceptions were taken as to the admissability of evidence showing that it was the custom among dealers to buy and sell gold coin in bulk by weight, and to deliver it in bags of $5,000 gold each, the buyer upon receiving it, putting the name of the person delivering upon the tag or label of the bag, so that he might know upon whom to make reclamation, if the bag should be found deficient in that amount ; all of which was not only admissable, but the defendants themselves proved that this was the mode pursued by them when a delivery was made, and that, though some weighed the gold, it was not the general custom.

Clark, one of the defendants' witnesses, was asked, whether, if these five bags of gold had been brought to the inner side of the counter, they would have been in his sight, which was objected to, and excluded. The witness had previously testified that the five bags were not brought to the inside of the counter so far as he knew, and that there was no person between him and the gold counter. He had also described the exact position in which he stood when he saw two persons bring in gold from Meyer & Greve ;—that is, that he was leaning against a shelf, six or eight feet from the counter, with his face turned toward the William street door, looking directly over the gold counter, his position being accurately shown to the jury by a diagram of the defendants' office, which was in evidence, and to which the witness referred. He testified that he saw Wheeler, the gold clerk, advance toward the counter, take two bags from the clerk Kirholtz, draw them toward the inner side of the counter, mark them and put them back upon the gold shelf; that he then saw Kirholtz leave the office ; that the next thing he heard or saw was Wheeler inquiring for Meyer & Greve, and upon being further interrogated, he said, that he saw the associate of Kirholtz leave the office before Wheeler made the inquiry, and saw him return in about three minutes afterward.

The testimony of this witness was not only in conflict with that of Corneilson, Kirholtz, and Mr. Gentil, the gold broker, but was throughout of a loose and very unsatisfactory character.

He could not say, positively, whether Wheeler took the two bags from Kirholtz, or Corneilson. He could not recollect how many bags of gold he saw on the counter, but simply that he saw more than two, nor how many bags the associate of Kir-holtz put on the counter. He could not and would not identify either Corneilson or Kirholtz as the associate left in charge of the gold, or swear that Corneilson, when pointed out to him in court, was the person whom he saw leave the office, go up the steps, and afterward return; or that when Wheeler took charge of the two bags there was some gold lying on the counter; but the two young men he referred to, were in charge of what was left; but he could not say what was the position of either of them with reference to it, or whether the hands or arms of either of them were around it. He was asked if he took his eyes off the counter, and answered that he supposed he did, and could not recollect anything he had done in that office that day, or how he was engaged, or what were his general duties upon that day. If the question excluded may be regarded as asking for the knowledge of the witness, it was objectionable, as assuming that the witness was or must have been looking upon the counter at the point of time when, according to Corneilson's account, Wheeler had drawn the five bags over to the inner side of the counter, and this is not inferrable from any thing which the witness had previously stated; while, if it called for his opinion, it was properly overruled. It is, in fact, very obvious, both from his previous and subsequent examination, that this question could elicit nothing but a hypothetical opinion from the witness, which was inadmissable. As respects the next exception, it appears that the witness, on the direct, testified positively that he saw Wheeler take the two bags from Kirholtz, but when subjected to a close cross-examination, he would not positively identify either Kirholtz or Corneilson as the person from whom he saw Wheeler draw the two bags of gold, nor identify either of them as the person who went out, or as the associate who remained. On his re-direct, he was asked if he had any doubt in his mind that Kirholtz was the man from whom Wheeler took the two bags. The question being objected to, was excluded, and properly; the witness having previously admitted very fully upon his cross-examination that he had.

It now remains to consider the further grounds upon which the defendant ask for a new trial. The first is that the verdict is against the weight of evidence, upon which it is simply necessary to say what I have already said, that the question of fact involved was one of great doubt and difficulty, which could only be determined by a jury, and that their finding upon it is conclusive upon the parties. In this is necessarily included the objection that the evidence of Corneilson is overthrown by the positive testimony of four witnesses who saw him leave the office, and that having made a false statement in this respect, it was the duty of the jury to have rejected his entire evidence. Whether he had or had not made a false statement in this particular was a question upon which he and these four witnesses were in conflict, and the jury must be regarded as having believed him instead of them. It was a question fairly before the jury, and was put to them very strongly by the judge, who told them that if they should find that Corneilson left the office, then he had deliberately sworn to a falsehood, and his testimony might and ought to be rejected by them. Some of the defendants' witnesses could not identify him as the man whom they saw leave and return again after the bag was missing ; and the jury, with the question fairly before them, have believed him in preference to the other witnesses.

Some of the propositions which the judge was requested to charge were embraced in the motion for a nonsuit, and have already been considered and disposed of. Others he did charge, and one not previously considered he refused to charge, to which the defendants excepted, as well as to what he did charge on the subject. The proposition was this : that if the testimony, on the part of the plaintiffs, was balanced by that on the part of the defendants, the defendants were entitled to a verdict. The judge had already charged that the burden of proof was upon the plaintiffs, and that it was incumbent upon them to satisfy the jury that the gold had been delivered to the defendants, which was all that the defendants could ask, for it was equivalent to saying that if the plaintiffs had not succeeded in satisfying them of that, then the defendants were entitled to a verdict. In no view in which the case can be regarded,

could it, or did it, present the aspect of evenly balanced testi-- mony. It was a mere question of credibility, in which the main witnesses on the part of the plaintiffs were directly in conflict with the main witnesses relied upon by the defendants. The question was, which were to be believed. If the plaintiffs' witnesses gave a true account of what had occurred, the plaintiffs were entitled to recover. If they did not, and the defendants' witnesses told the truth, there could be no recovery by the plaintiffs. It was not a case in which the witnesses on the one side could be regarded as exactly poised or balanced against those of the other in any view which the jury might take of the case. There may possibly be such a thing in a case as a conflict of evidence evenly balanced, but not, I apprehend, where the question is whether one witness upon the one side or four upon the other, have sworn to the truth. The witnesses were not numerically balanced; and if they were, it would make no difference, for a jury may be better satisfied with the state-- ment of one witness than with the conflicting evidence of a dozen. The judge, upon refusing to charge as requested, told the jury that it was their duty to reconcile the evidence if possible; that if it was so nicely balanced that it was difficult to tell which way the scale was, they were still to determine where the preponderance of evidence was, and turn the scale there; to which the defendants excepted. This was yielding more to the defendants' proposition than was necessary in a case where the conflict arising presented simply the question of credibility of the respective witnesses, and, taken in its fullest extent, it was nothing more than telling the jury that it was for them to determine where the preponderance lay, to which I cannot see any objection, if the defendants were not entitled, as I hold they were not, to have their proposition submitted to the jury.

The judge was asked to charge that if the plaintiffs were entitled to recover, no recovery could be had for the premium on gold, which he refused to do, and the defendants excepted. The price of the gold was fixed by the terms of the contract, and I know nothing in the law which forbids parties to sell gold, whether it is in bullion or in coin, at any price which they

think proper to agree upon, or which would make such a contract invalid. With respect to the bag delivered on the 29th of September, it was sent by the plaintiffs' letter at 212½, and was paid for, it is to be presumed, at the same rate as the other four, nothing to the contrary appearing.

The exception to that part of the charge in which the judge told the jury that it was not necessary, under the circumstances disclosed by the plaintiffs' case, that Wheeler should have completed the marking of all the tags of the bags, to place the gold at the defendants' risk, and that if the bags were drawn to the inner side of the counter in the manner described by Corneilson, there was such a taking of the physical possession of the bags by the defendant as made the delivery complete, and placed the gold at the defendants' risk, merely raises two points which I have already sufficiently considered and passed upon.

The subsequent conduct of Corneilson, and his employment by the plaintiffs, was not received in evidence under exception, as was the case in respect to the evidence which the judge in *Erben* v. *Lorillard* (19 N. Y. 299), afterward in his charge directed the jury to disregard. As this was evidence which had been given without objection, I am not prepared to say that it was error in the judge to tell the jury that they might take it into consideration, when weighing the question of Corneilson's credibility, a matter in respect to which the jury have a wide range; but if it were, it was no sooner excepted to, and the judge's attention called to it, than he said that there might be some doubt about the propriety of that instruction, though he had none himself, and that he retracted it. This was very different from the case above cited; the rule there applied, in the language of Justice Grover, being that " when illegal evidence, properly excepted to, has been received during a trial, it must be shown that the verdict was not affected by it, or the judgment will be reversed; that if the evidence may have affected the verdict, the error cannot be disregarded;" and that it necessarily did in that case may be inferred from the remark of Chief Justice Denio, that, except upon that evidence, it was difficult to account for the verdict. It was the same in the three other cases relied upon (*Penfield* v. *Carpenter*, 13 Johns.

350; *Haswell* v. *Bussing*, 10 *id.* 128; *Irvine* v. *Cook*, 15 *id.* 239), in all of which evidence was improperly admitted under objection, and as was said by the court in the first of these three cases (*Penfield* v. *Carpenter*), no subsequent caution or advice by the judge, that the jury ought to disregard what the witnesses had sworn to, could cure the irregularity. It is very different, however, when a judge tells a jury that they may consider certain evidence which is in the case in its bearing upon the credibility of a witness, but when his attention is called to this particular instruction, he weighs the matter more deliberately, and upon fuller reflection tells the jury they are not to consider it. This is the very reason why an exception to any part of a judge's charge, to be available, is required to be taken at the trial, that an opportunity may be afforded, before the case is finally submitted to the jury, to correct any error or mistake which the judge may have made in the instructions given. In the one case judges can, and constantly do, correct errors or mistakes in their charges when their attention is called to them; but in the other case evidence objected to as improper is received, and may, being sworn to, have an affect upon the minds of the jury, an affect not necessarily overcome or eradicated by the judge telling the jury afterward to disregard it.

This, I think, embraces all the questions raised upon the motion for nonsuit. The judgment should be affirmed.